BOILLIN-HARRISON COMPANY v. J. B. KEEBLE, JR., Trustee, and THE NEW YORK LIFE INSURANCE COMPANY.

Middle Section. November 21, 1931.

Petition for Certiorari denied by Supreme Court, March 26, 1932.

Seay, Stockell, Edwards & Keeble, of Nashville, for appellants, J. B. Keeble, Jr., trustee, et al.

H. B. Stout and Collier Goodlett, both of Clarksville, for appellee, Boillin-Harrison Co.

CROWNOVER, J. This is a contest between the mortgagee of a crop grown on mortgaged land and the mortgagee of the land, over the tobacco crop which had been severed from the soil by the mortgagor, in possession, after the date of the first advertisement of sale of the land and before the date on which the sale was advertised to be held under foreclosure proceedings.

John Roe, a farmer of Montgomery County, on July 16, 1923, executed a deed of trust to Andrew L. Todd, trustee for the New York Life Insurance Co., of New York City, conveying his farm of 197⅓ acres to secure the payment of a $14,000 loan, on the amortization plan, extending over a period of thirty-five years, an annual note being due on May 1st of each year in the sum of $965.72.

The deed of trust expressly provided that upon default "the party of the third part (the trustee) is authorized and empowered to enter and take possession of said property and before or after entry to advertise the same. . . ." It also contained the following paragraph:

"Until default shall be made in the payment of any of the sums herein secured, or intended so to be, or in performance of the agreements or obligations herein contained, the said parties of the first part (the mortgagors) shall retain possession, use and enjoyment of said premises and property."

After the execution of the deed of trust Andrew L. Todd resigned as trustee for the Insurance Company and John Bell Keeble, Jr., was regularly appointed substitute trustee.

From May 1, 1927, to September 24, 1929, the loan was in default for failure to pay all or a part of the amounts due under the deed of trust.

John Roe was indebted to the Hurst-Boillin Co., now the Boillin-Harrison Co., to a considerable extent from 1927 on, and was also indebted to George Fort of Clarksville who held a second mortgage against the land.

In 1927 and 1928 an agreement was entered into between Roe, George Fort, Boillin-Harrison Co. and the New York Life Insurance Co., by which Roe borrowed sufficient money from the Boillin-Harrison Co., securing the indebtedness by a mortgage on his tobacco crop, to make the crop, pay something on his indebtedness to the Boillin-Harrison Co. and pay something on the mortgage to the New York Life Insurance Co. By this arrangement something was paid each year to the New York Life Insurance Co. and the Boillin-Harrison Co.

George Fort negotiated with the Insurance Company about this arrangement in 1927 and 1928, and the Insurance Company withheld foreclosure proceedings.

In 1929 Roe borrowed $800 from the Boillin-Harrison Co. and executed a mortgage to E. H. Harrison, trustee for said Company, upon his individual crop of tobacco and his interest in all share crops of tobacco grown on his farm during 1929, to secure the payment of the note of $800, dated June 11, 1929, due January 1, 1930, and to also secure the balance owing complainant on his former indebtedness of $2038.45.

The Boillin-Harrison Co. loaned said $800 to Roe with the express understanding and agreement that it was to be used in raising a crop of tobacco upon said farm and in paying the delinquent portion of Roe's mortgage indebtedness to the said insurance company. Out of this $800 loan it paid for Roe taxes on said land in the sum of $180 and paid to the Insurance Company $400. This check for $400 was delivered to George Fort to be paid to the Insurance Company.

The Boillin-Harrison Co. was under the impression that Fort would negotiate with the Insurance Company, as in 1927 and 1928, and thought that the acceptance of the $400 by the Insurance Company indicated that it would not foreclose in 1929.

But some time in May, 1929, negotiations were had between the representative of the Insurance Company and Roe, in which the Company agreed not to foreclose the loan during the year 1929, provided Roe would promptly pay the balance due on the May 1, 1928

installment, approximately $600, and pay the delinquent taxes. When the Company received the $400 it informed Roe that he would have to pay an additional $200 by the middle of July in order to avoid foreclosure.

The $200 was not paid. On July 20, 1929, the Trustee declared the whole debt due under the acceleration clause and advertised said land for sale on September 4, 1929, at 12:30, but did not take possession. The advertisements appeared August 5th., 12th., 19th. and 26th., 1929.

On September 3, 1929, the Boillin-Harrison Co. filed its original bill against the trustee and the Insurance Company, praying for an injunction to restrain the defendants from selling Roe's land, and praying that upon a hearing the defendants be enjoined from selling the land under the deed of trust until complainant could enforce its lien upon the crop of tobacco. The bill recited that the Boillin-Harrison Co. had loaned Roe $800 and had taken a mortgage to secure the debt on his 1929 tobacco crop with the understanding that the New York Life Insurance Co. would not foreclose against the property during the year 1929 in order that the Boillin-Harrison Co. might realize upon the security behind its loan, and further recited that the crop of tobacco was then standing on the land and had not matured sufficiently to be cut, and that it would not be severed prior to the sale, which was set for September 4, 1929; and that if the defendant were permitted to proceed to sell said land complainant would lose its entire debt against Roe. A restraining order was issued and executed upon the trustee. Accordingly the sale was not held on September 4, 1929.

The Insurance Company filed its answer and cross-bill, in which it alleged, among other things, that the chattel mortgage upon the tobacco grown upon the land was subject to all the terms and provisions of the real estate mortgage, etc.; denied that it had made any agreement with anyone not to foreclose the mortgage in 1929; and further alleged that Roe was insolvent, and that the land would probably not bring at foreclosure sale an amount sufficient to pay the debt of the Insurance Company; and prayed that the injunction restraining the sale be dismissed; that an injunction issue to prevent complainants from cutting and disposing of the tobacco crop; that a receiver be appointed to take charge of said crop; that the money realized from the sale of said tobacco crop be awarded cross-complainant; and that cross-complainant be awarded damages for the wrongful issuance of the injunction. Injunction was issued commanding complainant not to cut or interfere with the tobacco crop.

On October 5, 1929, the complainant filed its amended bill, setting out practically the same allegations as the original bill.

The Insurance Company and trustee filed their joint answer to the amended bill, relying upon the same defenses as set out in the original answer.

On October 5, 1929, the complainant filed its answer to the cross-bill, in which it alleged that prior to the filing of its original bill a large and substantial portion of the tobacco crop had been cut and removed from the land.

Upon motion of the defendants the injunction was dissolved and the land was sold at foreclosure sale on November 13, 1929, at which sale it was bought in by the New York Life Insurance Co. for $10.000. Additional advertising expenses were incurred in the sum of $45.50.

Upon dissolution of the injunction E. H. Harrison was appointed receiver to take charge of the tobacco crop, market it and hold the proceeds subject to the further orders of the court. After the crop had been sold, by consent of counsel, the share croppers were permitted to receive the benefit of their part of the crop, leaving in the hands of the receiver $1111.89, representing the landlord's share of the crop.

Proof was taken, in which complainant proved by a number of witnesses that practically all of the tobacco crop had been severed from the land prior to September 4, 1929, to which defendant excepted.

The case came on for hearing and when complainant attempted to read such proof before the Chancellor, the defendants objected to the introduction of any proof contradictory to the allegations in the original bill as amended that the tobacco crop was growing on the land on September 4, 1929.

On February 19, 1931. complainant moved the court to be allowed to amend its original bill, and presented in open court the affidavit of E. II. Harrison, vice-president of complainant Company, in which he stated in substance that the original bill was prepared by complainant's solicitor upon information and data given him by the affiant some ten days prior to September 3, 1929, and that at the time this information was given to said attorney the tobacco had not matured sufficiently to be cut and had not been severed from the soil: that when the bill was presented to the affiant for his signature he did not have time to read it over for the reason that it had to be filed immediately and presented to the court for a fiat for an injunction, and therefore affiant signed the bill and made oath without noticing the allegation in the bill that the tobacco crop was still standing uncut on the land; and that such allegation was made inadvertently and through oversight on the part of the affiant; and that affiant did not advise his solicitor that practically all the tobacco crop had been cut and severed from the soil at the time the bill was

filed. Whereupon the complainant was permitted to amend its original bill to allege that at the time the foreclosure sale was advertised to be made practically all of the tobacco of the said Roe, in fact all but about three-fourths of an acre of one of the tenants, had been cut and severed from the soil.

After the hearing the Chancellor decreed that as a matter of fact practically all of the crop had been severed from the land on September 4, 1929, and that the allegations in the original bill as first amended did not constitute a judicial estoppel, having been made inadvertently and by mistake, and he awarded the proceeds of the tobacco crop to the Boillin-Harrison Co. He further decreed that the injunction bill was wrongfully sued out and awarded judgment against the Boillin-Harrison Co. for the additional advertising expenses and for interest on the Insurance Company's loan from September 4 to November 13, 1929.

The defendant, the New York Life Insurance Co., appealed from that decree to this court and has assigned errors.

It is established by the proof that the crops were actually severed from the soil before the sale was made. The contentions of the defendant Insurance Company are:

(1) That it, as mortgagee of the land, was entitled to the proceeds of the crop on the theory that the crop was cut after default and after foreclosure advertisement, and under the terms of the mortgage belonged to the mortgagee.

(2) The original bill having stated that the crops were standing on the land on September 4th, complainant was judicially estopped to introduce proof that they had been severed before that date, in direct contradiction of the original bill.

(3) The Chancellor erred in permitting complainant to amend its original bill at the hearing so as to allege that the allegation in it that the tobacco crop was growing on September 4th, was made by inadvertence and mistake.

1. The Tennessee rule is that where lands are sold under a foreclosure sale the title to the growing crops passes to the purchaser at the sale, but where the crops are severed from the land before the sale, or entry for the purpose of foreclosure, or the appointment of a receiver, they are the property of the mortgagor.

> "While growing crops are considered for some purposes as a part of the realty and may be covered by the lien of a mortgage, yet the mortgagor is the owner of all crops sown, grown and harvested before foreclosure, with full power to sell or mortgage the same. . . . This right of the mortgagor to the crops continues until foreclosure, entry for the purpose of foreclosure, or the appointment of a receiver, whereupon the right to the

unsevered crops or other products of the land passes to the mortgagee as a part of the property liable to the satisfaction of his claims." 41 C. J., 624, sec. 601; Akin v. Egner, 8 Tenn. App., 560.··

In the case of Jones v. Adams (Ore.), 50 L. R. A., 338, it is said:

"Until foreclosure and sale, a mortgagor of real estate is entitled to the possession, rent, issues and profits therefrom. He has an absolute right to all annual crops planted or owned by him and if they are severed before the sale he is under no liability to account for them to the mortgagee or purchaser."

Wiltsie on Mortgage Foreclosure (4 Ed.), sec. 798, states:

"The crops growing on the land, as well as the land, are held as a security for the mortgage debt, and on the foreclosure of the mortgage, whatever crops are then growing upon the mortgaged premises, even if planted subsequently to the making of the mortgage, will pass to the purchaser at the sale, whether they were planted by the mortgagor or his tenant, free from all claims upon them by such mortgagor or tenant and by all parties foreclosed: and on a proper application, under some circumstances, the court will provide for their preservation until possession is given to the purchaser."

In 2 Jones on Mortgages (8 Ed.), sec. 860, it is stated:

"The mortgagor, until foreclosure or possession taken by the mortgagee, is entitled to emblements, and, when they are severed, has an absolute right to them without any liability to account for them. They are covered by the mortgage until severance, but belong to the mortgagor afterward. A mortgagee not in possession can not, therefore, maintain trespass quare clausum against one who cuts and removes the grass, or other annual crops. The same rule applies to an ice crop cut by the mortgagor or his lessee before a foreclosure of the mortgage."

In 2 Wiltsie on Mortgage Foreclosure (4 Ed.), sec. 798, it is stated:

"Where crops are severed before the actual sale of the property in mortgage foreclosure, they are deemed personal property and the purchaser takes no title thereto."

The same author further states:

"The title and possession remain in the mortgagor until such conveyance upon sale; the interest of the mortgagee remains until then that of a mere lienor. The commencement of a foreclosure gives him no title, as his mortgage is only a security for a debt: the title and seizure remain in the mortgagor until the referee's deed upon sale is actually delivered to the purchaser." 2 Wiltsie on Mortgage Foreclosure (4 Ed.), sec. 1033.

And again he says:

"A mortgagee in possession has certain rights, but in order that the holder of a mortgage may acquire the rights of a mortgagee in possession, there must be an actual possession effected with the consent of the owner of the equity of redemption or effected by virtue of some other lawful authority binding on such owner." 2 Wiltsie on Mortgage Foreclosure (4 Ed.), sec. 1032.

"In Tennessee the mortgagee is said to hold the legal title and may recover possession of the land at once by action at law; but by express stipulation or by tacit consent the mortgagor retains possession of the mortgaged premises and exercises all the rights of owner over the premises. Henshaw v. Wells, 9 Humph., 581; Reeves v. John, 95 Tenn., 440, 32 S. W., 312; Bank v. Ewing, 12 Lea, 601; Maney v. Killough, 7 Yerg., 444; 4 Kent Com. (2 Ed.), 154; Brier Hill Collieries v. Gernt, 131 Tenn., 542, 175 S. W., 560." Lieberman, Loveman & Cohn v. Knight, 153 Tenn., 268, 283 S. W., 450.

The mortgagee is entitled to immediate possession, unless it is otherwise provided in the deed. Bank v. Ewing, 12 Lea, 598.

"The mortgagee has a right to the possession, but, if he does not take such possession, it amounts to a tacit agreement that the mortgagor shall retain it." Maney v. Killough, 7 Yerg., 440, 444.

"While in theory the rule prevails in Tennessee that the mortgagee takes the legal title and is entitled to possession, in practice the doctrine is only applied when necessary to protect the mortgagee's security afforded by the estate. In no sense can it be said that the common-law rule in its strictness prevails here. . . . This rigorous rule has been modified in Tennessee, so that the debt becomes the principal fact, and the estate mortgaged to secure the debt merely collateral." Hickman v. Cantrell, 9 Yerg., 172.

"In Reid v. Bank, 1 Sneed, 262, 274, it was said: 'For the mortgagee is considered as a creditor, not owner; and the only interest he has in the land, consists in a lien or security for the payment of his debt. It is a mere chattel interest. The mortgagor may exercise the rights of owner, if he do not commit waste or otherwise impair the security.'" Lieberman, Loveman & Cohn v. Knight, supra.

"In this state it was settled at an early date that, on a bill to foreclose, the court would not vest title in the mortgagee, but would direct a sale. Hord v. James, 1 Tenn., 201. And this ruling has been uniformly followed, the mode and conditions of sale being, in the absence of specific contract, regulated by statute. The mortgage is treated as a mere security for the debt, and

although the right to recover possession at law upon the legal title has not been denied, yet the mortgagee in possession is held to a strict account for rents and profits. Overton v. Bigelow, 10 Yerg., 58; Young v. Henderson, 4 Hayw., 10. And, when the mortgagee is out of possession, it is the corpus of the property, not its rents and profits, which constitutes the fund for the satisfaction of the debt. Whitmore v. Parks, 3 Humph., 95, 99.'' Williams v. Noland, 2 Cooper's Chy., 151.

''A mortgagee is, therefore, not entitled as a matter of right, in the absence of any stipulation of contract on ·the subject, to claim the rents or hires of the mortgaged property pending the litigation. To entitle him to impound such rents or hires, it must appear that the property itself is inadequate, and the mortgagor irresponsible.'' Williams v. Noland, supra.

''A mortgagee has no specific lien upon the rents and profits of the mortgaged land unless he has in the mortgage stipulated for a specific pledge of them as part of his security.'' Cowan v. Gill, 11 Lea, 674, 688.

''If in possession, so far from being entitled to the beneficial enjoyment of hire, or rents and profits, he is liable to account for them to the mortgagor.'' Whitmore v. Parks, 3 Humph., 95.

''In Tennessee the mortgage is always treated as a mere security for the debt, and when the mortgagee is out of possession, it is the corpus of the property, not its rents and profits, which constitute the fund for the satisfaction of the debt. Cowan v. Gill, 11 Lea, 674, 688; Bennett v. Holt, 2 Yerg., 8; Whitmore v. Parks, 3 Humph., 95; Henshaw v. Wells, 9 Humph., 568; Williams v. Bartlett, 4 Lea, 620, 625.'' 9 Michie's Ency. Digest of Tenn. Reports, p. 171.

''A mortgagor is considered the owner of all crops grown and harvested before foreclosure, with power to sell or mortgage them; but upon the mortgagee's entry for the purpose of foreclosure, or the appointment of a receiver, the right to standing crops or other products of the soil passes to the mortgagee as part of the property liable for satisfaction of his claims. Whenever the mortgagee has the right to enter, the mortgagor is subject to ejectment without notice and the mortgagor is not entitled to the growing crops.'' 2 Jones on Mortgages, sec. 985; Langford v. Hudson, 146 Tenn., 309, 241 S. W., 393; Akin v. Egner, supra.

Hence the first assignment is not well made and must be overruled.

2. We are of the opinion that judicial estoppel does not apply in this case. All the Tennessee cases hold that a judicial estoppel will not arise where the inconsistent statement was made inadvertently,

or through mistake. Sartain v. Dixie Coal & Iron Co., 150 Tenn., 633, 266 S. W., 313; Jetton v. Nichols, 8 Tenn. App., 567, 577. The affidavit of E. H. Harrison shows that the tobacco was standing when he gave the information to his attorney that a bill might be filed; that when the bill was presented to him about ten days later for his signature he did not have time to read it over, as it had to be filed immediately in order to secure an injunction to prevent the sale, and he did not notice that the bill contained the allegation that the crop was still standing on the land. The statement in the original bill that the tobacco was standing on September 4th, being an inadvertence and mistake, complainant was not judicially estopped to prove that the crop had been severed before September 4, 1929; hence this assignment must be overruled.

3. Not being judicially estopped complainant had a right to amend the bill at any time before final decree.

"The allowance of amendments is largely a matter in the sound discretion of the trial court and his rulings will not be disturbed unless there is evidence that the discretion was abused." Dreher v. Hill, 5 Tenn. App., 10; Gibson's Suits in Chancery, sec. 427.

It results that all the assignments of errors are overruled and the decree of the Chancellor is in all things affirmed. A decree will be entered in this court for $221.35, together with interest from July 3, 1931, to the present, in favor of cross-complainant New York Life Insurance Co. and against Boillin-Harrison Co. The cost of the lower court will remain as adjudged below against Boillin-Harrison Co. and the surety on its prosecution bond, but the cost of the appeal is adjudged against appellant, New York Life Insurance Co. and the surety on its appeal bond. Executions will issue accordingly.

Faw, P. J., and DeWitt, J., concur.